# EXHIBIT 1

## SWORN DECLARATION OF GAIL SCHECHTER

I, Gail Schechter, being of sound mind and over the age of eighteen (18), do hereby state that I have personal knowledge of the matters asserted herein, and should I be called to testify in a court of competent jurisdiction, would state the following:

1.    I was employed with the Department of Veterans Affairs (hereinafter "VA" or "Agency"), continuously, without a break in service from March 6, 2006, through February 13, 2025, when I was notified at approximately 7 PM ET that I was terminated.

2.    During the course of my 17+ years as an employee of the VA, I served as a Supervisory Dietitian, Human Resource Specialist (Employee and Labor Relations) and as an Attorney in the Office of General Counsel (OGC) North Atlantic District.

3.    I am a 55-year-old woman with a disability which qualifies me as a "Schedule A" employee.

4.    Over the course of my VA career, I have had the opportunity to participate in countless initiatives from clinical care to billing reforms. My career has allowed me to see, and impact, multiple aspects of the healthcare delivery system. I have been a part of teams that reviewed and implemented new models of delivering patient care, the process for documenting care and reviewing the performance of clinical staff.

5.    I have worked in acute care, long-term care, outpatient care, and home-based primary care. I have also worked on countless administrative projects and central office initiatives.

6.    These opportunities have given me a broad-based understanding of how the VA functions, and more importantly, of how important a VA employee's reputation for professionalism and ethical conduct is to his or her career. This is even more true for an Attorney representing the VA.

1

7.    My vast knowledge of the Agency enabled me to be an outstanding Senior Human Resource Specialist (HRS) in Employee and Labor Relations (ER/LR) and an Attorney in the Office of the General Counsel (OGC).

8.    When I transferred from being a Supervisory Dietitian to being a HRS ER/LR, the gaining Human Resource (HR) Department recognized that I had spent at least 50% of my time, serving Human Resource functions. This HR department was confident that I met the criteria of being in the "same or similar" line of work as evidence by noting on my personal records that I had "Completed Service Requirement for Career Tenure from 3/5/2006 to 3/5/2009." In addition, to being a licensed attorney I also had HR experience which translated into a GS 12 (Full Performance Level) HRS ER/LR.

9.    The Chief of Human Resources for that Network, also and attorney, recognized the value of having HRS ER/LR employees who are trained attorneys to decrease litigation and have a Team of HR talent ready and able to support OGC and their growing caseloads.

10.    When I was employed with the VA in the capacity of a HRS (ER/LR), the Agency benefited from my legal knowledge and training and relied on my ability to serve as a legal advisor and representative, even if I was not technically part of OGC.

11.    While attending law school in the evenings, I served as an extern with the OGC, Midwest Division to hone my legal skills, with a focus on the research and litigation skills I would need as a licensed attorney, with the goal of obtaining full-time permanent employment with the OGC.

12.    While I was an OGC extern, I had the great pleasure to work with two seasoned OGC attorneys investigating and researching their Merit System Protection Board (MSPB) cases and Equal Employment Opportunity Commission (EEOC) cases. I also was able to work on Step 3 grievances and arbitration preparation with these two experienced attorneys.

2

13.    Those attorneys and others advised me to apply for a position in HR ER/LR to continue to craft my legal skills and gain experience in a large variety of cases. They advised that many of the "best" OGC attorneys come from HR as a training ground.

14.    During law school I also had the opportunity to work with the facility Hostile Work Environment (HWE) program coordinator. In that role I was able to use my legal skills to interview employees, develop evidence files and generate report of findings documents and recommendations for disposition.

15.    I continued to work in the clinical administrative setting during COVID. After graduating law school in 2020 and passing the New York State Bar Exam, I became a licensed Attorney in the State of New York on March 26, 2021. From that time onward I used my knowledge, training and skills as a Licensed Attorney in the performance of my job duties at the VA.

16.    While working in HRS:

a.    I served as the liaison investigating complex complaints made to the Office of Accountability and Whistleblower Protection (OAWP). During these investigations, I used my legal skills to research and interpret legal and regulatory program guidance, including case law, and the United States Code. For example, one case involved a Medical Provider who was reported to be moonlighting at the adjoining University Hospital. However, a review showed that the Medical Provider did not hold an appointment at the University Hospital. This discovery necessitated taking the testimony of multiple witnesses and analyzing the rules and regulations governing both VA physicians and non-VA physicians. Once all the evidence and research was gathered, I analyzed it and  worked with OAWP, after submitting the completed report, to ensure the file met their needs and also provided a timely legal resolution to the issue.

b.    I routinely interpreted the Code of Federal Regulations, and VA Handbooks and Directives.  For example, I worked with a centralized clinical call center to develop policies for monitoring and recording employees that meet privacy, HIPPA, and VA guidelines, while at the same time ensuring compliance with the Union Master Collective Bargain Agreement obligations.

c.    I routinely worked with leaders to ensure disciplinary actions and evidence files were carefully and thoroughly assembled to withstand legal challenges.

d.    I worked collaboratively with the Department of Labor, the Office of Inspector General (OIG), Office of Special Counsel (OSC), Equal Opportunity Employment (EEO), Merit System Protection Board (MSPB), Federal Services Impasses Panel, and the Federal

Labor Relations Authority. For example, after the Union called OSHA to investigate safety concerns in a VA facility due to construction, I used my knowledge and skills to represent management in third-party proceedings to coordinate responses to multiple Agencies. I gathered evidence and served as the technical advisor for the Fact-Finding investigations into employee misconduct.

e.    In response to an American Federation of Government Employees (AFGE) Step 3 grievance, I worked with a Senior OGC Attorney to review years of records of police officers signing in and out for their weapons, to defend the Agency against claims of wage and hour violations. I reviewed the evidence and evaluated the Agency's legal defenses to claims it was required to pay employees for the time it took to check their weapons in and out. After careful and complete legal analysis, the Agency agreed to a settlement agreement in lieu of a likely costly loss at arbitration.

f.    I served as a subject matter expert regarding policies and procedures pertaining to Federal Labor Relations Authority (FLRA). For example, I successfully defended the Agency against findings of Unfair Labor Practices (ULPs). Specifically, I represented the Agency against violations of Article 48 of the AFGE Master Agreement, pertaining to "official time" wherein agency officials were accused of contract violations. This work also included completing legal research and analysis into appropriate legal arguments and potential liability.

g.    I worked with the Chief of Nursing, OGC and Local Authorities on a case involving narcotics that had been stolen from the VA and found during a routine traffic stop. My knowledge of the VA rules and regulations for Title 38 appointments combined with the OGC's local contacts in law enforcement allowed us to quickly and accurately strategize a legal plan to protect the Agency, ensure the employee's rights, and above all. ensure that Veterans were receiving their appropriate doses of narcotics.

h.    These cases and others were assigned to me because of my background and training as an attorney. Other employees in my position had a greater focus on reviewing performance and working on lower-level disciplinary actions.

17.    The core functions of an HRS ER/LR an OGC attorney are the same in that both: 1) serve as advisors, 2) research case law, and 3) interpret and apply statutes. To say that these roles are not the "same or similar" is categorically wrong.

18.    My experience in HRS ER/LR allowed me to transition into the Full Performance Level (GS 14 role) in OGC in May 2024. When my resume and qualifications package were reviewed by the OGC HR Department there was a recognition of my prior legal work in a "same or similar line of work" as evidenced by assigning me to the GS 14 grade.

19.    The work I did in OGC was the same or similar to the work I did in HR. Some of the work, such as reviewing disciplinary and adverse actions was essentially the same with the only difference being my the title of Attorney versus HRS ER/LR when I signed off as completing the final review. Other work, for example representing the Agency in EEOC and MSPB hearings was so similar to what I had done in HR it required little to no adjustment. I believe this is why I was so successful in the role, without needing a steep learning curve.

20.    Once in OGC I was able to harness my vast knowledge of VA policies, procedures and protocols to immediately assist clients, customers and co-workers.

21.    For example, I covered a case involving possible weapons in the home of a Veteran receiving Home Based Primary Care (HBPC). Because I had knowledge of the HBPC program, polices, and regulations and knowledge of Federal and State law, I was quickly and accurately able to access the situation and provide recommendations to the client. A less seasoned attorney would have had to spend considerable time just to understand HBPC.

22.    Working either as an attorney, or in human resources requires professionalism and absolute integrity. My ability to secure post-VA employment is significantly impaired because my service has been labeled not to be in the "public interest" due to "performance."

23.    Having been a Federal Employee for close to 18 years, any individual reviewing my resume would classify me as a "Federal Employe" and rightfully so. I am a proud, dedicated public servant. However, given the current rhetoric regarding federal employees including prominent politicians saying, "Federal Employees don't deserve their jobs" and others saying that Federal employees are "lazy," "corrupt," and/or "more interested in helping themselves than helping others," finding other meaningful employment is extremely difficult. Further, when asked why I left my last

position I will be bound by my ethical duty as an attorney and my personal ethics to tell the truth: "I was told it was due to performance issues."

24.    Even if I did not to voluntarily have to reveal this, the fact that I was terminated within my probationary period of my first official job as an attorney would be clearly indicative of either poor performance or poor conduct.

25.    As a second career attorney, who has only practiced law for a few years I have fewer prospects of future employment than those typically coming out of law school.

26.    If I chose to apply for admission to a new jurisdiction, I would have to disclose that I was terminated due to "performance." I would have to say this, even though all evidence indicates that my performance was stellar. I was an outstanding performer for almost 18 years. The reputational harm inflicted on me by one letter that falsely mis-characterizes my professional performance is beyond upsetting. It is life altering and career impacting.

27.    I am a 55-year-old woman, so my age works against me when looking for a new job. However, I am by no means old enough or ready to retire. My passion and drive to advocate for Veterans and other populations still impassions me to work hard for the benefit of others. I need only the opportunity to continue to prove myself as an attorney.

28.    The legal community is a very small community, in which my reputation for integrity and good judgment is paramount and will follow me wherever I go. The fact that I was let go less than a year into my first legal job will be a negative mark on my resume for the foreseeable future.

29.    My professional reputation has already been sullied by the fact that I was withdrawn as counsel in the middle of several cases I was working on. This left my client confused, as well as the courts and tribunals in which I had made an appearance.

And further Affiant sayeth not.

I, Gail Schechter, swear and/or affirm, under the federal penalties for perjury, that the matters asserted herein are true and accurate to the best of my knowledge.

February 27, 2025
Date

*Gail Schechter e/s*
Gail Schechter

# EXHIBIT 2

# UNITED STATES OF AMERICA
# MERIT SYSTEMS PROTECTION BOARD

|  |  |  |
|---|---|---|
| **U.S. OFFICE OF SPECIAL COUNSEL,** <br> *ex rel.* **Former Employee** ▮ <br> **Petitioner** <br><br> **v.** <br><br> **DEPARTMENT OF VETERANS AFFAIRS,** <br> **Respondent.** | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | **Docket No.** <br><br> **Date:** February 21, 2025 |

## U.S. OFFICE OF SPECIAL COUNSEL'S
## INITIAL REQUEST FOR STAY OF PERSONNEL ACTIONS

The U.S. Office of Special Counsel (OSC) requests that the Merit Systems Protection

Board (Board) stay for 45 days the probationary termination of former federal employee ▮,

hereinafter "Complainant ▮," by the Department of Veterans Affairs (VA).[1]  *See* 5 U.S.C. §

1214(b)(1)(A); 5 C.F.R. § 1201.134.  OSC requests that this stay request be adjudicated together

with the concurrently-filed requests to stay the probationary terminations of former federal

employees ▮, ▮ ▮ ▮, and ▮ (collectively with Complainant ▮, the "Complainants"),

by the Department of Education (ED), Department of Energy (DOE), Department of Housing

and Urban Development (HUD), Office of Personnel Management (OPM) and Department of

Agriculture (USDA) (collectively with VA, the "Agencies").

---

[1] To ensure compliance with the Board's procedural requirements, Complainant ▮ has consented to be identified in this stay request, but asks that the Board use a pseudonym in its decision and any other publicly-available document.  In consideration of this request, OSC has used Complainant ▮'s name in the caption, but otherwise refers to them by their initials and asks that the Board do the same.  Complainant ▮ is fully identified in the attached termination notice and declaration, which they provided to OSC in support of their prohibited personnel practice complaint.

1

OSC has reasonable grounds to believe that the Agencies engaged in prohibited personnel practices under 5 U.S.C. § 2302(b)(12) by terminating Complainants in violation of the federal laws and regulations governing probationary terminations and reductions in force (RIF). *See* 5 U.S.C. § 3502; 5 C.F.R. Part 351; 5 C.F.R. § 315.801 *et seq*. As a result, OSC has an obligation to request relief from the Board where appropriate. 5 U.S.C. § 1212(a) ("The Office of Special Counsel *shall*…protect employees…from prohibited personnel practices…and, where appropriate [] bring petitions for stays") (emphasis added).

## INTRODUCTION

In accordance with its legal responsibility to safeguard the merit system, OSC seeks this stay because the probationary terminations at issue in this matter appear to have been effectuated in a manner inconsistent with federal personnel laws. In most cases, probationary employees in the competitive service may only be terminated if their performance or conduct demonstrates that they are unfit for federal employment. If agencies wish to terminate probationary employees not for performance or conduct, but as part of a general restructuring or downsizing, they must initiate a reduction in force (RIF) and follow the relevant procedures for that process.

As described below, the rules for probationary terminations and conducting RIFs are not technicalities. Rather, they implicate federal employees' substantive and procedural rights.

## STATEMENT OF FACTS

## I.   PREPARATIONS MADE TO REDUCE AND REORGANIZE THE FEDERAL WORKFORCE

Between January 20 and February 11, 2025, President Trump and OPM issued executive orders and memoranda in connection with plans to reduce and reorganize the federal workforce. For example, on January 20, 2025, the President issued an Executive Order establishing the Department of Government Efficiency, and OPM issued guidance on probationary periods,

advising agencies that probationary periods are "an essential tool for agencies to assess employee performance and manage staffing levels," directing agencies to provide OPM with a list of all probationary employees, and instructing agencies to "promptly determine" whether probationary employees should be retained.[2]  On February 11, 2025, the President issued an Executive Order directing agency heads to "promptly undertake preparations to initiate large-scale reductions in force…" and to develop "[r]eorganization [p]lans."[3]  According to public reporting, on February 13, 2025, OPM officials met with federal agency leaders to provide guidance on how to carry out probationary termination actions as part of the broader effort to restructure and downsize the federal workforce.[4]

## II.    THE AGENCIES' TERMINATIONS OF COMPLAINANTS

Between February 12 and February 14, 2025, the Agencies terminated Complainants, probationary employees at six separate federal agencies, from federal service.  Based on public reporting, each was terminated at the same time as significant numbers of other federal employees.[5]  The language in Complainants' termination notices is quite similar and does not describe any specific issues with any of the Complainants' performance or conduct.  Notably,

---

[2] EXEC. ORDER NO. 14158, *Establishing and Implementing the President's "Department of Government Efficiency,"* 90 Fed. Reg. 8441 (Jan. 20, 2025); U.S. OFF. OF PERSONNEL MGMT., Guidance on Probationary Periods, Administrative Leave and Details (Jan. 20, 2025).

[3] EXEC. ORDER NO.14210, *Implementing The President's "Department of Government Efficiency" Workforce Optimization Initiative*, 90 Fed. Reg. 9669 (Feb. 11, 2025); *see* WHITE HOUSE, Fact Sheet: President Donald J. Trump Works to Remake America's Federal Workforce (Feb. 11, 2025) (explaining that DOGE will assist with "shrink[ing] the size of the federal workforce," "large-scale reductions in force," "reducing the size and scope of the federal government," and "shrink[ing] the administrative state.").

[4] Jory Heckman, *OPM advises agencies to fire probationary employees after 'deferred resignation' deadline*, Fed. News Network (Feb.13, 2025), https://federalnewsnetwork.com/workforce/2025/02/opm-fires-probationary-employees-after-deferred-resignation-deadline/; Ted Oberg, *Trump administration tells federal agencies to fire probationary employees*, NBC4 (Feb. 13, 2025), https://www.nbcwashington.com/news/president-trump-politics/opm-federal-agencies-probationary-employees-trump-administration/3844634/.

[5] Tami Luhby et al., *Thousands of probationary employees fired as Trump administration directs agencies to carry out widespread layoffs*, CNN (Feb. 14, 2025), https://www.cnn.com/2025/02/14/politics/probationary-federal-employees-agencies-firings-doge/index.html.

only three of the notices mention performance or conduct at all as a justification for the termination, and none provide any detail or individualized assessment.

The following is the specific factual information relevant to each Complainant, based on the information OSC has reviewed to this point:

### I.    ED Program Support Specialist

Complainant ■ served as a probationary Program Support Assistant in the competitive service with ED. Ex. 1, Complainant ■ Declaration, ¶¶ 3-4. Complainant ■ was hired with a 100% disabled veteran's preference after 14 years with the Army. *Id.*, ¶ 5. Throughout his tenure, he received consistent praise from leadership, and there is no evidence of any performance issues. *Id.*, ¶ 9. However, on February 12, 2025, Complainant ■ was issued a termination notice that stated, in relevant part:

> I regrettably inform you that I am removing you from your position of Program Support Specialist with the agency and the federal civil service effective today.

Ex. 2, ED Notice. Earlier that same day, Complainant ■ s supervisor had commended his exceptional performance, praising his dedication and calling him a perfect fit for the team. Ex. 1, ¶ 11.

Both Complainant ■ and the media reported that, on or around February 12, 2025, about 60 probationary employees at ED received written notifications that they were being terminated, effective immediately. *Id.*, ¶ 15.[6]

---

[6] Joey Garrison, *Firings across federal government begin after Trump, Musk order sweeping cuts*, USA TODAY (Feb. 13, 2025), https://www.usatoday.com/story/news/politics/2025/02/13/trump-musk-federal-workforce-mass-firings/78524273007/.

### 2.    *DOE Program Communications Specialist*

Complainant ▮ served as a probationary Program Communications Specialist with

DOE in the excepted service. Ex. 3, Complainant ▮ Declaration, ¶¶ 3-4. Complainant ▮'s

performance record was strong, with no documented performance or conduct issues. *Id.,* ¶¶ 8-9.

In December 2024, Complainant ▮ received a "Significantly Exceeds Expectations"

performance rating. *Id.* Despite her supervisor's request for the agency to retain her, she was

terminated on February 13, 2025. *Id.,* ¶ 3. The termination notice stated, in relevant part:

> Per OPM instructions, DOE finds that your further employment would not
> be in the public interest. For this reason, you are being removed from
> your position with DOE and the federal civil service effective today.

Ex. 4, DOE Notice.

On or around February 13, 2025, DOE terminated between 1,200 and 2,000 employees,

including probationary employees. According to public reporting, notices provided to many of

these employees stated that their further employment would not be in the public interest.[7] A

DOE official reportedly said that DOE removed OPM's suggested phrasing citing "performance

reasons" from its termination letters because many of the terminated employees had performed

well during their probationary period.[8]

### 3.    *HUD Trial Attorney*

Complainant ▮ served as a probationary Trial Attorney in the excepted service with

HUD. Ex. 5, Complainant ▮ Declaration, ¶¶ 3-4. Complainant ▮ had very good performance

and, in November 2024, Complainant ▮ received an "4" performance rating. *Id.,* ¶ 9.

---

[7] Gabe Whisnant & Peter Aitken, *Trump Moves to Fire Staff Overseeing Nuclear Weapons Then Backtracks—Report*, NEWSWEEK (Feb. 14, 2025), https://www.newsweek.com/trump-fires-hundreds-staff-overseeing-nuclear-weapons-report-2031419.

[8] Shannon Bond et al., *Sweeping cuts hit recent federal hires as Trump administration slashes workforce*, NPR (Feb. 13, 2025), https://www.npr.org/2025/02/13/nx-s1-5296928/layoffs-trump-doge-education-energy.

Complainant ▮ has also received several performance awards and has not been informed of any performance or conduct issues. *Id.* On February 14, 2025, Complainant ▮ received a notice of termination that contained the following language:

> The purpose of this notice is to notify you of the decision to terminate your employment with the U.S. Department of Housing and Urban Development (HUD), during your trial period, in order to promote the efficiency of the federal service in accordance with the priorities of the Administration…After careful consideration, the Agency is terminating your employment as of the date of the transmission of this email, during your trial period as *part of a workforce restructuring of the Agency*.

Ex. 6, HUD Notice (emphasis added).

Senator Patty Murray issued a press release expressing concern from several senators over reports that HUD had terminated hundreds of probationary employees on February 14.[9]

### 4.    *OPM Benefits Analyst*

Complainant ▮ worked at OPM as a probationary Benefits Analyst in the excepted service. Ex. 7, Complainant ▮ Declaration, ¶¶ 1, 3.[10] Complainant ▮ received a positive performance rating during her tenure, with no indication of any performance or conduct issues. *Id.*, ¶ 2. Although Complainant ▮'s managers repeatedly requested that Complainant ▮ be retained, on February 13, 2025, Complainant ▮'s employment was terminated. *Id.*, ¶ 5. The termination notice states, in relevant part:

> The Agency finds, based on your performance, that you have not demonstrated that your further employment at the Agency would be in the public interest. For this reason, the Agency informs you that effective at the close of business today (February 13, 2025), you are being terminated from your position with the Agency and the federal civil service during your trial period.

---

[9] Press Release, U.S. Senator Patty Murray. Murray, Warren, Gillibrand, Smith, and Schumer Demand Trump & Elon Halt Cuts to HUD Workforce, Press for Answers on HUD's Capacity to Meet Critical Functions & Deliver Essential Services (Feb. 16, 2025), https://www.murray.senate.gov/murray-warren-gillibrand-smith-and-schumer-demand-trump-elon-halt-cuts-to-hud-workforce-press-for-answers-on-huds-capacity-to-meet-critical-functions-deliver-essential-servic/.

[10] Due to an apparent numbering error, this declaration repeats several paragraph numbers.

Ex. 8, OPM Notice (emphasis removed). Complainant ▮'s supervisor, who was caught off guard by the termination, clarified that the action was not based on poor performance. Ex. 7, ¶¶ 5, 11.

According to public reporting, OPM terminated approximately 70 probationary employees on February 13, 2025. These employees were also told the agency finds "[b]ased on your performance, that you have not demonstrated that your further employment at the agency would be in the public interest."[11]

### 5.    *VA Training Specialist*

Complainant ▮, a disabled U.S. Navy veteran dedicated to serving fellow veterans, served in the excepted service as a probationary Training Specialist with the VA. Ex. 9, Complainant ▮ Declaration, ¶¶ 3-4, 6. Despite having no indication of performance or conduct issues, on February 13, 2025, Complainant ▮ received a termination notice. *Id.*, ¶¶ 3, 11. Until it was issued, Complainant ▮'s supervisor was unaware of the termination action, which stated, in relevant part:

> The Agency finds, based on your performance, that you have not demonstrated that your further employment at the Agency would be in the public interest. For this reason, the Agency informs you that the Agency is removing you from your position with the Agency and the federal civil service effective February 13, 2025.

*Id.*, ¶ 12, Ex. 10, VA Notice.

Complainant ▮ was one of over 1,000 probationary employees who were terminated on February 13, 2025. The agency released a statement that day, attributing the terminations to a

---

[11] Heckman, *supra* at n.5.

"government-wide Trump Administration effort to make agencies more efficient, effective and responsive to the American People."[12]

### 6.    USDA Loan Specialist

Complainant ▮ worked at USDA in the competitive service as a probationary loan specialist. Ex. 11, Complainant ▮ Declaration, ¶¶ 3-4. Throughout this tenure, he consistently exhibited strong performance and received positive feedback. *Id.*, ¶¶ 7-8. On February 13, 2025, Complainant ▮ was notified of his termination. *Id.*, ¶ 3. The termination notice states, in relevant part:

> The Agency finds, based on your performance, that you have not demonstrated that your further employment at the Agency would be in the public interest. For this reason, the Agency informs you that the Agency is removing you from your position….

Ex. 12, USDA notice. While the notice indicates that the action is based on Complainant ▮'s performance, Complainant ▮ had not been informed of any performance issues, nor did the notice cite specific concerns. Ex. 11, ¶ 11. Complainant ▮'s supervisor was "shocked" by the action, offering to rehire Complainant ▮ and serve as a reference. Ex. 11, ¶ 12.

Around the same time, USDA terminated probationary employees across three of its subagencies, including the U.S. Forest Service—which alone terminated up to 3,400 probationary workers.[13] As with Complainant ▮, according to public reporting, these terminated employees received a letter informing them that "[t]he Agency finds, based on your performance, that you have not demonstrated that your further employment at the Agency would be in the public interest."[14]

---

[12] Press Release, U.S. Dep't of Veterans Affs. VA dismisses more than 1,000 employees (Feb. 13, 2025), https://news.va.gov/press-room/va-dismisses-more-than-1000-employees/.

[13] Tami Luhby et al., *supra* at n.6.

[14] Leah Douglas, *USDA probationary staff fired at three agencies, sources say*, REUTERS (Feb.14, 2025), https://www.reuters.com/world/us/usda-probationary-staff-fired-two-research-agencies-sources-say-2025-02-14/.

## ARGUMENT

### I.    LEGAL STANDARD FOR STAY REQUESTS

OSC may request any member of the Board to order a stay of any personnel action for a

period of 45 days if OSC determines that reasonable grounds exist to believe that a personnel

action was taken, or is to be taken, as a result of a prohibited personnel practice. 5 U.S.C.

§ 1214(b)(1)(A)(i). Indeed, pursuant to 5 U.S.C. 1212, OSC has a legal obligation to protect

federal employees from prohibited personnel practices and petition for a stay "where

appropriate." See 5 U.S.C. § 1212(a).

OSC may file a stay request after the effective date of a personnel action. *Special

Counsel ex rel. Perfetto v. Dep't of Navy*, 83 M.S.P.R. 169, 173 (1999). The Board member

"shall" grant the stay "unless the [Board] member determines that, under the facts and

circumstances involved, such a stay would not be appropriate." 5 U.S.C. § 1214(b)(1)(A)(ii).

In evaluating the sufficiency of a stay request, the Board will view the facts in the light

most favorable to a finding that the personnel action to be stayed is the result of a prohibited

personnel practice. *Special Counsel v. Dep't of Treasury*, 70 M.S.P.R. 578 (1996). OSC's stay

request need merely fall within the "range of rationality" to be granted. *Perfetto,* 83 M.S.P.R. at

173 (quoting *In re Kass*, 2 M.S.P.R. 79, 96 (1980) (interpreting the predecessor provision to 5

U.S.C. § 1214)).

### II.    OSC HAS REASONABLE GROUNDS TO BELIEVE THAT THE COMPLAINANTS' TERMINATIONS VIOLATE 5 U.S.C. § 2302(B)(12)

Under 5 U.S.C. § 2302(b)(12), it is a prohibited personnel practice for an agency to take

or fail to take a personnel action where "the taking of or failure to take such action violates any

law, rule, or regulation implementing, or directly concerning, the merit system principles

contained in [5 U.S.C. § 2301]." Complainants allege that the probationary terminations

9

described in this Initial Request for Stay of Personnel Actions (Stay Request) are personnel

actions, as defined at 5 U.S.C. § 2302(a)(2)(A), that violate 5 U.S.C. § 3502, 5 C.F.R. Part 351,

and 5 C.F.R. § 315.801 *et seq*. These statutes and regulations concern the following merit system

principles:

- Selection and advancement should be determined solely on the basis of relative ability, knowledge, and skills;

- All employees should receive fair and equitable treatment with proper regard for their constitutional rights;

- The Federal work force should be used efficiently and effectively;

- Employees should be retained on the basis of the adequacy of their performance; and

- Employees should be protected against arbitrary action.

*See* 5 U.S.C. §§ 2301(b)(1), (2), (5), (6), (8)(A). As set forth below, OSC has reasonable

grounds to believe that the terminations therefore constitute prohibited personnel practices under

section 2302(b)(12).

### A.    The Probationary Terminations Appear to Violate RIF Statute and Regulations

The available evidence indicates that Agencies improperly used the probationary status of

employees to accomplish a RIF without affording the employees the substantive rights and due

process they are entitled to by law.[15]  Based on public statements, the Agencies' decision to

terminate large numbers of probationers was to accomplish reorganizations and cost savings; in

other words, a RIF.

---

[15] *See* U.S. OFF. OF PERSONNEL MGMT., Workforce Reshaping Operations Handbook A Guide for Agency Management and Human Resource Offices (2017), https://www.opm.gov/policy-data-oversight/workforce-restructuring/reductions-in-force/workforce_reshaping/.

framework mandated by Congress"). Importantly, probationary employees are not excluded

from RIF procedures. *See* 5 C.F.R. § 351.202. It is an agency's burden to prove before the

Board that its decision not to use RIF procedures complied with the regulations. *See Carter v.*

*Small Bus. Admin.*, 23 M.S.P.R. 309, 311-312 (1984) (citing *Losure v. Interstate. Com. Comm'n*,

2 M.S.P.R. 361, 365-66 (1980)).

Agencies cannot avoid following the RIF requirements when the purpose of the action is

to address a shortage of funds or a reorganization. *See McClure v. Fed. Emergency Mgmt.*

*Agency*, 32 M.S.P.R. 672, 676 (1987); *see also Moody v. Dep't of Justice*, 2009 MSPB LEXIS

1917, *7 (April 2, 2009).

### 2. *The Agencies Likely Cannot Meet their Burden to Show that RIFs Were Not Required to Terminate the Probationers*

Based on the evidence OSC has reviewed, including official directives, public statements,

and the termination notices issued to Complainants, it appears that the Agencies terminated

probationary employees not to eliminate poor performers but rather because of a purported lack

of work, shortage of funds, and reorganization, which require use of RIF procedures. *See* 5

C.F.R. § 351.201. For example, OPM directed agencies to provide lists of all probationary

employees and stated that "probationary periods are an essential tool for agencies to assess

employee performance and *manage staffing levels*."[17]

Additionally, the February 11, 2025 Executive Order directed agencies to start planning

for RIFs that would prioritize eliminating "offices that perform *functions* not mandated by statute

or other law" and excluding "*functions* related to public safety, immigration enforcement, or law

---

[17] U.S. OFF. OF PERSONNEL MGMT., Guidance on Probationary Periods, Administrative Leave and Details, *supra* at n.3 (emphasis added).

Because 1) agencies are prohibited from circumventing the requirements set forth in the RIF statute and regulations, which apply equally to probationary employees, 2) the evidence indicates that Agencies improperly terminated Complainants without reference to those requirements, and 3) the violation denied Complainants both substantive and procedural rights, OSC has reasonable grounds to conclude that Agencies have engaged in prohibited personnel practices.

### 1.    *Agencies are Prohibited from Circumventing RIF Requirements*

Agencies must follow the RIF statute and regulations when the employee's release is required for reasons including lack of work, shortage of funds, and reorganization. *See* 5 C.F.R. § 351.201. The regulations define a reorganization as "the planned elimination, addition, or redistribution of functions or duties in an organization." 5 C.F.R. § 351.203. The Federal Circuit has "defined a 'reduction in force' as an 'administrative procedure' by which agencies eliminate jobs and reassign or separate employees who occupied the abolished positions." *See Tippins v. U.S.*, 93 F.4th 1370, 1375 (Fed. Cir. 2024). OPM's website similarly explains that, "An agency is required to use the RIF procedures when an employee is faced with separation or downgrading for a reason such as reorganization, lack of work, [or] shortage of funds…."[16]

Each agency has the right to decide whether a RIF is necessary and when the RIF will take place. However, agencies do not have discretion to bypass RIF procedures when they are reorganizing or reducing the size of components based on lack of work or budgetary concerns. *See James v. Von Zemenszky*, 284 F.3d 1310, 1321 (Fed. Cir. 2002) (holding that the VA did not have "the authority to implement a system for implementing RIFs contrary to the title 5 RIF

---

[16] *Reductions in Force*, U.S. OFF. OF PERSONNEL MGMT., https://www.opm.gov/policy-data-oversight/workforce-restructuring/reductions-in-force/ (last visited Feb. 17, 2025).

enforcement" from RIFs.[18] Two days later, an OPM spokesperson described the mass

terminations as actions "in support of the President's broader efforts to *restructure* and

*streamline* the federal government."[19]

USDA and VA made their own public statements confirming that the purpose of their

February 13 terminations of Complainants and other probationary employees was supporting the

President's direction to downsize government agencies and reduce spending.[20]  A DOE official

reportedly described that OPM "had suggested the agency use a template that cited 'performance

reasons'" for probationary terminations but that DOE "had removed that phrasing because many

of the employees had performed well during their probationary period."[21]  These public

statements indicate that Agencies terminated Complainants and other probationary employees for

reasons that would require compliance with RIF regulations.

The content of the Complainants' termination notices further signals that the terminations

were issued to reduce the numbers of overall employees rather than because the Complainants

failed to meet expectations during their trial periods.  The Complainants all received their

termination notices between February 12 and 14.  *See* Ex. 2, 4, 6, 8, 10, 12.  The notices OPM,

USDA, and VA issued to Complainants all state that: "The Agency finds, based on your

performance, that you have not demonstrated that your further employment at the Agency would

be in the *public interest*." Ex. 4, 8, 10, 12 (emphasis added).  The DOE termination notice plainly

---

[18] EXEC. ORDER NO.14210, *Implementing The President's "Department of Government Efficiency" Workforce Optimization Initiative*, *supra* at n.4 (emphasis added).

[19] Rebecca Beitsch, *OPM Directs Agencies To Fire Government Workers Still On Probation*, THE HILL (Feb. 13, 2025), https://thehill.com/homenews/administration/5144113-federal-probationary-employees-fired/ (emphasis added).

[20] Robert Thorpe, *List of Federal Agencies That Have Begun Mass Layoffs of Probationary Employees*, NEWSWEEK (Feb. 14, 2025), https://www.newsweek.com/federal-agencies-that-have-begun-mass-layoffs-probationary-employees-doge-2031543; U.S. Dep't of Veterans Affs., *VA Dismisses More than 1,000 Employees*, *supra* at n.13.

[21] Shannon Bond et al., *supra* at n.9.

13

states that it is acting "*[p]er OPM instructions*." Ex. 4 (emphasis added). ED's notice did not provide any reason for the Complainant's immediate termination. Ex. 2. HUD's explanation in its notice to the Complainant did not mention performance and instead explained that it was terminating Complainant "*as part of a workforce restructuring of the Agency.*" Ex. 6 (emphasis added).

Based on the evidence available to OSC, there are reasonable grounds to believe that the Agencies improperly circumvented RIF regulations by terminating Complainants and other probationary employees *en masse* without regard to each employee's individual performance for the purpose of restructuring government agencies and reducing costs.

### 3.    Failing to Use RIF Requirements Deprives Employees of Substantive and Procedural Rights

The Agencies' failure to apply RIF regulations has deprived Complainants of substantive as well as procedural rights that could allow them to keep their jobs or be reassigned to new positions and would have allowed them, at a minimum, to remain employed during the RIF process. RIF regulations provide for an orderly process of determining which employees are retained rather than separated and ensuring that those decisions are made according to merit-based factors. *See* 5 U.S.C. § 3502; 5 C.F.R. §§ 351.501-506. The law requires that employees with better performance ratings and disabled veterans with veterans' preference are retained over other competing employees in their retention groups. 5 U.S.C. § 3502. For both excepted and competitive service employees, probationary employees are placed in the second of three retention groups. *See* 5 C.F.R. §§ 351.501-502.

The Complainants ▮ and ▮ are disabled veterans, whose status would afford them preference in the RIF retention schedules. Ex. 1, 9. The excepted service Complainants, whose probationary period is two years, terminated from DOE, HUD, USDA, and OPM all had

14

favorable annual performance ratings and tenure of more than one year, which could likewise give them preference over employees with shorter tenure and less favorable performance in a RIF. Ex. 3, 5, 7, 11. Thus, it is not a foregone conclusion that Complainants would be separated during a RIF.

In addition to the substantive rights to be considered for retaining their position or being reassigned to another position, the RIF regulations require agencies to provide employees with 60 days of notice and to keep employees in a paid status during that time if possible. *See* 5 C.F.R. §§ 351.803; 351.806. The notice is also required to provide employees with information about their right to reemployment and career transition assistance. *See* 5 C.F.R. § 351.803.

The regulations also provide employees subject to RIF with notice and the right to appeal their termination, demotion, or more than 30-day furlough to the Board. *See* 5 C.F.R. § 351.901. The Board's jurisdiction to hear an appeal of an action taken pursuant to a RIF or that should have been conducted pursuant to a RIF is not dependent on the individual's probationary status or on the length of the individual's current continuous service. *Bielomaz v. Dep't of Navy*, 86 M.S.P.R. 276, 280 (2000).

Accordingly, the Agencies' actions appear to have deprived Complainants of their entitlement to some additional period of employment, compensation, benefits, career transition assistance information, possible accrual of tenure, as well as due process rights.[22]

---

[22] Board precedent is consistent that the remedy to improper circumvention of RIF regulations is to cancel the action the agency took. *See e.g., Williams v. Dep't of Army*, 49 M.S.P.R. 405, 414 (1991).

**B.    The Probationary Terminations of Competitive Service Employees Appear to Violate Applicable Regulations**

The Civil Service Reform Act ("CSRA") provides that individuals hired into the competitive service must serve a one-year probationary or trial period.[23] 5 C.F.R. § 315.801-802. For these employees, the regulations promulgated by OPM state explicitly that agencies "*shall* utilize the probationary period as fully as possible *to determine the fitness of the employee* and shall terminate his or her services during this period if the employee fails to demonstrate fully his or her qualifications for continued employment." 5 C.F.R. § 315.803 (emphasis added). In short, to terminate a probationary employee, an agency "must honestly be dissatisfied with the probationer's conduct or performance after giving him a fair trial on the job." *McGuffin v. SSA*, 942 F.3d 1099, 1102 (Fed. Cir. 2019) (citing *Shaw v. United States*, 622 F.2d 520, 223 (Ct. Cl. 1980); *see also Perlongo v. United States*, 215 Ct. Cl. 982, 983 (1977).

Where an employee's "work performance or conduct during [his probationary] period fails to demonstrate his fitness or his qualifications for continued employment," an agency may terminate the employee by notifying him "in writing as to why he is being separated and the effective date of the action." 5 C.F.R. § 315.804(a). This notice "shall, as a minimum, consist of the agency's conclusions as to the inadequacies of his performance or conduct." *Id.*

Probationary employees have only limited rights to challenge personnel actions taken against them. 5 C.F.R. § 315.806. However, while the threshold for terminating a probationary

---

[23] The use of a probationary period to assess new employees has been an integral part of the civil service for over 100 years. Congress established a probationary period in the 1883 Pendleton Act, 22 Stat. 403, ch. 27 (amended 1978); *see* 22 Stat. 404, ch. 27, § 2(2)4; *see also Kato v. Ishihara*, 360 F.3d 106, 113 (2d Cir. 2004); *INS v. FLRA*, 709 F.2d 724, 725 n.1 (D.C. Cir. 1983). Congress reaffirmed the importance of the probationary period with the Civil Service Reform Act of 1978 ("CSRA"), 5 U.S.C. §§ 7101–7135, which expanded the probationary period beyond new employees to existing employees who are appointed to managerial and supervisory positions. *Compare* 5 U.S.C. § 3321 (1976) (establishing a "period of probation before an appointment in the competitive service becomes absolute") *with* 5 U.S.C. § 3321(a) (1982) (authorizing a probationary period for new employees and appointments to managerial and supervisory positions); *see also Nat'l Treasury Emps. Union v. Fed. Lab. Rels. Auth.*, 737 F.3d 273, 276–77 (4th Cir. 2013).

16

employee is significantly lower than for a tenured employee, it is not zero – probationary employees cannot be terminated "at will." Agencies must inform probationary employees of the specific reasons for their termination, which necessarily requires agencies to conduct an individualized assessment of their performance and conduct. This requirement is not a simple bureaucratic technicality – compelling agencies to assess the specific fitness of each employee prior to terminating them ensures that outstanding employees are not arbitrarily lost and that terminations are truly in the best interests of the federal service and consistent with merit system principles.

For these reasons, terminating probationary employees in the competitive service for reasons other than their individual fitness for federal employment violates 5 C.F.R. § 315.801 *et seq*. As these regulations and statutes implement or directly concern the merit system principles described in 5 U.S.C. §§ 2301(b)(1), (5), (6), and (8)(A), violating them constitutes a prohibited personnel practice under section 2302(b)(12).

Two of the Complainants in this matter were in the competitive service and OSC has reasonable grounds to believe that they were terminated in violation of 5 C.F.R. § 315.801 *et seq*. The declarations submitted by these Complainants lead OSC to believe that ED and USDA have not conducted any individualized assessments of their employees and instead seem to have issued form letters to terminate probationary employees *en masse*.

### 1.    *Complainant* ▮

The termination letter ED sent to Complainant ▮ states that "I regrettably inform you that I am removing you from your position of Program Support Specialist with the agency and the federal civil service effective today, February 12, 2025." Ex. 2 (ED letter). The letter does not allege that ED was taking this action due to any performance or conduct issues. *Id.*

17

Complainant ▮ submitted a declaration averring that he had no performance or conduct issues, and in fact that the feedback he had received was very good. Ex. 1, ¶ 9. Complainant ▮ also stated neither his upper management or his supervisor had been aware of his termination and that his supervisor was surprised by it. *Id.*, ¶¶ 11-12. Complainant ▮ stated that he was aware of one other probationary employee who received an identical letter and believes the same is true of about 60 other probationary employees. *Id.*, ¶ 15. This evidence, combined with the public statements discussed above about the government's rationale for removing probationary employees, provide OSC with reasonable grounds to believe that Complainant ▮ had no performance or conduct issues and that his termination constitutes a prohibited personnel practice under section 2302(b)(12) that should be stayed.

### 2. *Complainant ▮*

The termination letter USDA sent to Complainant ▮ states that "The Agency finds, based on your performance, that you have not demonstrated that your further employment at the Agency would be in the public interest." Exhibit 12 (USDA letter).

Although performance was referenced in the letter, there is no indication that USDA did an individual assessment of Complainant's work. In a declaration, Complainant ▮ also averred that his supervisor told him she was unaware of his termination and that his program director wanted to retain him. Ex. 11, ¶¶ 11-12. Complainant ▮ believes that six probationary employees in his department were terminated with an identical letter and stated that he understood the same was true of every USDA probationary employee in California. *Id.*, ¶¶ 13-16. This evidence, combined with the public statements discussed above about the government's rationale for terminating probationary employees, provide OSC with reasonable grounds to

18

believe that Complainant ▮ had no performance or conduct issues and that his termination constitutes a prohibited personnel practice under section 2302(b)(12) that should be stayed.

It is noteworthy that, as discussed in detail above, the termination letters DOE, HUD, OPM, and VA issued to their own probationary employees follow a similar pattern. In no case do the letters OSC has reviewed demonstrate that Agencies are conducting individualized assessments to ensure they are terminating probationary employees only for performance, conduct, or pre-appointment conditions. Rather, the text of these letters and public statements indicate that Agencies terminated probationary employees to accomplish organizational objectives and not due to the performance or conduct of individual probationers.

## III. A 45-DAY STAY OF COMPLAINANTS' TERMINATIONS IS APPROPRIATE

The Board must grant the Special Counsel's request for a stay unless the Special Counsel's claim is "inherently unreasonable." *Special Counsel v. Dep't of Veterans Affairs*, 45 M.S.P.R. 403, 405 (1990) (citing *Kass*, 2 M.S.P.R. at 91).

Here, OSC has reasonable grounds to believe that the Agencies violated 5 U.S.C. § 2302(b)(12) because 1) for all the named Complainants, the Agencies failed to comply with applicable RIF statutes and regulations; and 2) in terminating Complainants ▮ and ▮, the relevant Agencies did not comply with 5 C.F.R. 315.804. *See* 5 U.S.C. § 1214(b)(1)(A)(i). A stay of these terminations will allow OSC to investigate further their complaints and minimize the adverse consequences of the apparent prohibited personnel practice. *See Special Counsel v. Dep't of Navy*, 85 M.S.P.R. 92, 25 (2000) ("A stay granted pursuant to 5 U.S.C. § 1214(b) is issued to maintain the *status quo ante*..."); *see also Special Counsel v. Dep't of Veterans Affairs*, 60 M.S.P.R. 40 (1993). Here, the consequences for Complainants are grave, including loss of pay and benefits, loss of their federal careers, and deprivation of their legal rights.

## REQUEST FOR RELIEF

OSC requests that a member of the Board:

1. Order the Department of Veterans Affairs to stay, for a period of 45 days, Complainant

    ███'s probationary termination and return Complainant ███ to full pay and duty status until

    the stay expires or is otherwise lifted;

Respectfully submitted,

*Hampton Dellinger*

Hampton Dellinger
Special Counsel

███████

U.S. Office of Special Counsel
1730 M Street, N.W., Suite 218
Washington, D.C. 20036-4505

20

# EXHIBIT 3

# Position Designation Record

| | |
|---|---|
| Department | DEPARTMENT OF VETERANS AFFAIRS VA |
| Agency | DEPT OF VETERANS AFFAIRS-VETERANS HEALTH ADMINISTRATION |
| Supplemental Duty | |
| Position Title | Human Resources Specialist (ER/LR) |
| Position Description | |
| Series and Grade/Pay Band | GS-0201-12 |
| Position Description Number | 99976-A |
| Designator's Name & Title | Maria Z. Barana, Human Resources Consultant (Classification) |

# Final Position Designation and Investigation

| Sensitivity Level | Risk Level | Investigation | Form |
|---|---|---|---|
| Non-Sensitive | Moderate Risk | Tier 2 | SF 85P |

| Label | Points |
|---|---|
| Total Initial Position Designation Points from Step 2 | 16 |
| Adjusted Position Designation Points from Step 3 | 21 |

# Summary

## National Security

No national Security Duties

## Suitability

| Duties | Degree of Potential for Compromise or Damage |
|---|---|
| Protection of personal, private, controlled unclassified, or proprietary information-with the potential to damage the public's trust (includes access to or processing of personal information such as that protected by the Privacy Act (PA) of 1974, exempt from disclosure under the Freedom of Information Act (FOIA), financial data, or privileged information involving the award of contracts, contractor proprietary | Moderate impact<br>Access and control over personal, private, proprietary, or controlled unclassified information, the unauthorized disclosure of which could negatively impact the public's trust, through serious damage/harm to:<br>• The integrity or efficiency of the service<br>• Individuals or business entities<br>• Government programs or operations impacting the public's trust |

| Duties | Degree of Potential for Compromise or Damage |
|---|---|
| information, etc.) | |
| Government service delivery, including customer service or public liaison duties | Limited impact<br>• Duties involve customer service responsibilities and/or public liaison that could cause limited damage to individuals, business entities, or government programs or operations |

## Adjustment for Scope of Program and Correlation to Extent of Impact

| Program Scope and Impact | Impact |
|---|---|
| Adjustment for Scope of Program and Correlation to Extent of Impact | Agency Impact<br>• Program operations affect only one agency. Misconduct or damage would have potential for a local impact on the agency, and/or the individuals or private entities affected by the agency. |
| **Level of Supervision** | **Ability to act independently** |
| Adjustment for level of supervision or other controls | Limited or no supervision - ability to act independently in almost all areas almost all of the time<br>• Occasional review from a perspective of major policy issues by a superior who likely has no relevant expertise in the technical aspects of the duties performed. |

Designator's Name:    Maria Z. Barana, Human Resources Consultant (Classification)

Designator's Signature:    Maria Z. Barana 243313    Digitally signed by Maria Z. Barana 243313 Date: 2020.11.25 13:12:00 -07'00'    Date: 11/25/2020

such as gaining compliance with established policies and regulations through persuasion or negotiation.

## Factor 8. Physical Demands

No special physical exertion is required. The work is primarily performed while sitting at a desk, conferences, meetings, etc., and occasional visits to activity work sites. Though some work may require periods of standing.

## Factor 9. Work Environment

The work area is adequately lighted, heated and ventilated. The work environment includes everyday low risks or discomforts which require normal safety precautions typical of offices, meeting and training rooms, or commercial vehicles.

## Other Significant Facts

### CustomerService

Meets the needs of customers while supporting VA missions. Consistently communicates and treats customers (Veterans, their representatives, visitors, and all VA staff) in a courteous, tactful, and respectful manner. Provides the customer with consistent information according to established policies and procedures. Handles conflict and problems in dealing with the customer constructively and appropriately.

### ADP Security

Protects printed and electronic files containing sensitive data in accordance with the provisions of the Privacy Act of 1974, and other applicable laws, federal regulations, VA and VHA statutes and policies. Protects data from unauthorized release or loss, alteration, or unauthorized deletions. Follows applicable regulations and instructions regarding access to computerized files, release of access codes, etc., as set out in the computer access agreement that the incumbent signs.

setting implications. Advisory services, technical support, and policy guidance responsibilities include, but are not limited to, labor relations, disciplinary and adverse actions, performance management, performance-based actions, grievances (negotiated and administrative), appeals, special inquiries, and leave administration. Extensive contacts with officials throughout the agency and other departments is a requirement of the position. The work is complicated because it requires the incumbent to analyze, justify, and defend highly complex issues characterized by rapidly changing conditions, precedent-setting impact on organizations, substantial controversy, and resistance to successful resolution. Extensive research must be conducted into factual and case law so that a plan can be developed for an appropriate case theory that includes anticipation of counter arguments.

**Factor 5. Scope and Effect**

The work involves advising managers and employees on complex problems and issues that typically require analyzing and/or troubleshooting a wide range of unusual conditions (for example, pay issues, automated personnel data systems, policies, procedures, position management and organizational design). The incumbent continuously provides management with advisory services on significant issues and, when needed, provides training to familiarize employees with HR programs and procedures. The work of the HR Specialist provides support to VA in meeting overall mission requirements and objectives while ensuring that objectives and effectiveness of agency HR activities, missions, and programs are met and may serve as a basis for the office to commit to specific courses of action. The assessment, analysis, and ultimate resolution of problems promotes the overall quality, effectiveness, and efficiency of program operations.

**Factor 6. Personal Contacts**

Contacts include managers and employees throughout the network, VACO, applicants, retirees, beneficiaries, multiple labor organizations, and persons outside the agency, including consultants, attorneys, contractors, or business executives, in moderately unstructured settings. This level may also include contacts with agency officials who are several managerial levels removed from the employee when such contacts occur on an *ad hoc* basis. The specialist must recognize or learn the role and authority of each party during the meeting. Contacts may involve adversarial interactions or situations in which the incumbent is charged with providing unwelcomed consultative and advisory services to executive staff, managers, supervisors, employees and applicants.

**Factor 7. Purpose of Contacts**
Purpose of the contacts is to influence and persuade employees and managers to accept and implement findings and recommendations. May encounter resistance due to such issues as organizational conflict, competing objectives or resource problems. Must be skillful in approaching contacts to obtain the desired effect,

and provide technically accurate interpretations of negotiated agreement provisions and reconcile conflicting technical viewpoints. Serves as principal point of contact on labor management matters of overall concern to established bargaining units at the local level (i.e. grievances, unfair labor practice charges, information sharing, contract interpretation, labor relations training, and preparation and conduct of contract bargaining).

Knowledge of, and skill in applying, labor relations theory, principles, methods, precedents, case law, and negotiation processes and strategies (e.g., mutual gains bargaining, traditional versus collaborative negotiating, non-traditional collaborative approaches, labor-management partnership, alternative dispute resolution, interest-based bargaining, and facilitation); and management's continuing obligations under the Labor Relations Statute and Collective Bargaining Agreement in order to conduct research to provide when consulting and advising on all areas.

### Factor 2. Supervisory Controls

The supervisor provides broad guidance on policies, identifies areas of special emphasis and assigns work. Works independently, having broad discretion to develop project plans, methods and schedules. Determines the most appropriate principles, practices, and methods to apply in all phases of assignments, including the approach to be taken, degree of intensity, and depth of research in management advisories. Interprets regulations on own initiative, applies new methods to resolve complex and/or intricate, controversial, or unprecedented issues and problems, and resolves most of the conflicts that arise. Review of technical substance is usually of a cursory nature. The supervisor is available for advice or assistance on new or unusual problems, and exploration of alternative courses of action.

### Factor 3. Guidelines

Guidelines consist of administrative policies, laws and regulations, which are applicable but stated in general terms and may be in conflict with the provisions of applicable laws or are so general in nature that considerable judgment and ingenuity are required to interpret and apply them to specific assignments.

Considerable judgment and ingenuity are required in deviating from established methods to modify, adapt, and/or refine broader guidelines to resolve specific complex and/or intricate issues and problems, treat specific issues or problems, and research trends and patterns.

### Factor 4. Complexity

Assignments involve providing a full range of advisory services, assistance, and policy guidance to management officials and employees concerning all aspects of labor management and employee relations programs involving precedent-

implementation or full bargaining at the appropriate level (local, network, or national bargaining). Plans and implements actions to satisfy obligations to bargain in good faith, performs thorough analysis of policies and practices, and ensures that policies and practices promote partnering to prevent unfair labor practices. The incumbent reviews third-party involvement in negotiations and represents the network in appropriate cases, serves as a point of contact on third-party proceedings arising from the labor management programs, such as unfair labor practice charges.

Represent management at arbitrations and in situations involving proceedings before other third-parties, as appropriate.

Performs other related duties as assigned.

**FACTOR LEVELS**

**Factor 1. Knowledge Required by the Position**

The incumbent must have expert-level knowledge of, and skill in applying, employee and labor relations principles, practices, and legal and regulatory requirements; and analytical skill to advise management and employees.

The incumbent must have knowledge of, and skill in applying, employee relations concepts, principles, practices, and case law (e.g., related to reasonable accommodation, prohibited HR practices, and third-party powers and procedures) in order to advise management. They must have skill in researching case law, research facts in order to create solutions to problems even if guidelines are not always directly applicable.

The incumbent must have knowledge of, and skill in applying, the full range of labor relations theories, principles, methods and techniques to conduct studies for management and respond to union interests at the bargaining table. Provide training and communication to management on agency-wide labor relations and employee relations policies and procedures.

Knowledge and skills to represent management in third-party proceedings. Knowledge of how other government agencies' rules and regulations impact the Department of Veterans Affairs. Ability to collaborate with the Department of Labor, the Office of Inspector General (OIG), Office of Special Counsel (OSC), Equal Opportunity Employment (EEO), Merit System Protection Board (MSPB), Federal Services Impasses Panel, and the Federal Labor Relations Authority.

Skilled in fact-finding, interviewing, and case management techniques to advise on and/or conduct investigations, such as AIB, DAB, and OAWP.

Knowledge of, and skill in applying, labor relations theory, principles, methods, and precedents; and applicable local negotiated agreements in order to advise

in response to a range of conduct and performance problems; explains rules and procedures to employees and helps them understand their rights and obligations. Determines appropriate FLSA and BUS codes for all positions. Responsible for submission of properly coded personnel actions in collaboration with the Technical Reviewer.

Conducts and Advises on ER matters, all proposed adverse actions, coordination and oversight, including OAWP, DAB, AIB, fact findings, grievance examiner, state licensure reviews, suitability, Drug Free Workplace, Workplace Violence Prevention Program, and third-party hearing representation. This may include resolution of administrative grievances, post separation reviews, Congressional, Office of Inspector General (OIG), Office of Special Counsel (OSC), Equal Opportunity Employment (EEO), Merit System Protection Board (MSPB) or department level complaints.

Reviews requests and submits justification for those ER/LR actions requiring approval by Network Director, VHA, VA, or higher authority, then takes appropriate action, and prepares necessary correspondence.

The incumbent must also apply a high degree of insight and technical competence to recognize and accomplish management objectives without sacrificing fundamental principles. The incumbent must have the stature, foresight, maturity, and ability to negotiate and reach amicable solutions to complex and controversial problems.

**Labor Relations**                                                           **50%**
Provides services to an integrated healthcare network, ensuring strict adherence to all contractual and regulatory timeframes. Develops management strategies to respond to labor issues. Prepares appropriate agency responses to labor-related matters. Offers technical guidance, information and assistance to management and senior leadership officials on sensitive, serious, and controversial labor relations issues regarding employees in a wide variety of administrative and clinical occupations with substantial differences in working conditions, entitlement, and occupational practices and policies. Incumbent provides technical and consultative guidance, including actions of a disciplinary or adverse nature, grievances, demands to bargain, impasse proceedings, local bargaining, unfair labor practices, performance management and recognition, employee counseling, appeals, complaints, drug testing and related functions. Provides management with interpretation of policies, procedures, and collective bargaining agreements. Researches and interprets legal and regulatory program guidance, including case law, United States Code, Code of Federal Regulations, and VA Handbooks and Directives. The incumbent serves as subject matter expert regarding policies and procedures pertaining to Federal Labor Relations Authority (FLRA) and Federal Services Impasses Panel (FSIP).

The incumbent analyzes changes to regulations and policies to determine the impact on the labor relations program; determines need for impact and

**POSITION DESCRIPTION**
**VETERANS HEALTH ADMINISTRATION  (VHA)**
**VETERANS INTEGRATED SERVICES NETWORK (VISN)**
**Shared Services Unit (SSU)/Strategic Business Partner (SBP)**
**Human Resources Specialist (ER/LR)**
**GS-0201-12**
**PD# 99976-A**

**INTRODUCTION:** The VHA has adopted the HR Modernization and Shared Services (SS) Implementation, which is a new model of organizing and consolidating essential Human Resource (HR) functions and services to the VISN level. This improvement to HR service delivery will best support the needs of the VISN's diverse workforce and the expectations of management related to the acquisition, compensation, retention, and performance of staff, as well as the consistent execution of HR-related administrative functions to benefit both staff and Veterans. This streamlined and focused approach moves VHA forward in its continuum of providing comprehensive, compassionate, and coordinated care to Veterans.

**MAJOR DUTIES**

**Employee Relations**                                                                  **50%**
Incumbent provides technical guidance, advice and counseling to management officials and supervisors to address issues with workforce-related conduct and performance. Develops strategies to respond to employee-related issues. Prepares appropriate agency responses to employee relations matters. Provides consultation on associated program areas, such as reasonable accommodation and leave management. Delivers training for management and employees on a variety of employee relations topics. Incumbent prepares a variety of correspondence on behalf of the agency to address complex employee relations matters including, disciplinary and adverse actions, settlement agreements, and congressional correspondence.

Provides services to an integrated healthcare network, ensuring strict adherence to all contractual and regulatory timeframes. Advises management officials at all levels of the network, including senior leaders, about appropriate disciplinary or other corrective techniques in response to a range of conduct and performance problems. Explains rules and procedures to employees and management to help them understand rights and obligations while maintaining and encouraging objectivity in situations that may be charged with emotion and involve assumptions. Resolves disputes and evaluates events and/or identifies aggravating or mitigating factors relevant to the case. Conducts extensive analysis to identify obscure or underlying causes of misconduct or poor performance. Helps managers and supervisors focus on performance management processes, including planning, monitoring, developing, rating, and rewarding performance. Advises managers about appropriate disciplinary or other corrective techniques

# POSITION DESCRIPTION *(Please Read Instructions on the Back)*

| | | 1. Agency Position No. #99976-A |
|---|---|---|

| 2. Reason for Submission | 3. Service | 4. Employing Office Location | 5. Duty Station | 6. OPM Certification No. |
|---|---|---|---|---|
| ☐ Redescription  ☒ New | ☐ Hdqtrs  ☒ Field | VISN | | |
| ☐ Reestablishment  ☐ Other | | | | |

**Explanation *(Show any positions replaced)***
SBP

| 7. Fair Labor Standards Act | 8. Financial Statements Required | 9. Subject to IA Action |
|---|---|---|
| ☒ Exempt  ☐ Nonexempt | ☐ Executive Personnel Financial Disclosure   ☐ Employment and Financial Interest | ☒ Yes  ☐ No |

| 10. Position Status | 11. Position Is | 12. Sensitivity | 13. Competitive Level Code |
|---|---|---|---|
| ☒ Competitive | ☐ Supervisory | ☒ 1—Non-Sensitive   ☐ 3—Critical | X-20 |
| ☐ Excepted *(Specify in Remarks)* | ☐ Managerial | ☐ 2—Noncritical Sensitive   ☐ 4—Special Sensitive | 14. Agency Use |
| ☐ SES (Gen.)  ☐ SES (CR) | ☒ Neither | | BUS: 8888 |

| 15. Classified/Graded by | Official Title of Position | Pay Plan | Occupational Code | Grade | Initials | Date |
|---|---|---|---|---|---|---|
| a. Office of Personnel Management | | | | | | |
| b. Department, Agency or Establishment | | | | | | |
| c. Second Level Review | | | | | | |
| d. First Level Review | Human Resources Specialist (ER/LR) | GS | 0201 | 12 | DB | 09/12/2019 |
| e. Recommended by Supervisor or Initiating Office | Human Resources Specialist (ER/LR) | GS | 0201 | 12 | PS | 08/27/2019 |

| 16. Organizational Title of Position *(if different from official title)* | 17. Name of Employee *(if vacant, specify)* |
|---|---|
| HR Specialist (ER/LR), SBP | |

| 18. Department, Agency, or Establishment | c. Third Subdivision |
|---|---|
| DEPARTMENT OF VETERANS AFFAIRS | |
| a. First Subdivision | d. Fourth Subdivision |
| VETERANS HEALTH ADMINISTRATION | |
| b. Second Subdivision | e. Fifth Subdivision |
| VISN HR OFFICE | |

| 19. Employee Review-This is an accurate description of the major duties and responsibilities of my position. | Signature of Employee *(optional)* |
|---|---|

20. **Supervisory Certification.** I certify that this is an accurate statement of the major duties and responsibilities of this position and its organizational relationships, and that the position is necessary to carry out Government functions for which I am responsible. This certification is made with the knowledge that this information is to be used for statutory purposes relating to appointment and payment of public funds, and that false or misleading statements may constitute violations of such statutes or their implementing regulations.

| a. Typed Name and Title of Immediate Supervisor | b. Typed Name and Title of Higher-Level Supervisor or Manager *(optional)* | |
|---|---|---|
| Patrick D. Shea | | |
| Signature *Pat Shea* Digitally signed by Patrick D. Shea 168915 Date: 2019.09.04 13:46:14 -05'00' | Date 09/04/2019 | Signature | Date |

21. **Classification/Job Grading Certification.** I certify that this position has been classified/graded as required by Title 5, U.S. Code, in conformance with standards published by the U.S. Office of Personnel Management or, if no published standards apply directly, consistently with the most applicable published standards.

| 22. Position Classification Standards Used in Classifying/Grading Position |
|---|
| ADMIN WK IN HRMG, GS-0200, DEC 2000 |

Typed Name and Title of Official Taking Action
DEBORAH E. BERRY, WMC CONSULTANT, CLASS

| Signature *Deborah E Berry* | Date 09/12/2019 |
|---|---|

**Information for Employees.** The standards, and information on their application, are available in the personnel office. The classification of the position may be reviewed and corrected by the agency or the U.S. Office of Personnel Management. Information on classification/job grading appeals, and complaints on exemption from FLSA, is available from the personnel office or the U.S. Office of Personnel Management.

| 23. Position Review | Initials | Date | Initials | Date | Initials | Date | Initials | Date | Initials | Date |
|---|---|---|---|---|---|---|---|---|---|---|
| a. Employee *(optional)* | | | | | | | | | | |
| b. Supervisor | | | | | | | | | | |
| c. Classifier | | | | | | | | | | |

24. Remarks
Cybersecurity Code: 000 Not Applicable
Position is subject to duplication

25. Description of Major Duties and Responsibilities *(See Attached)*

| NSN 7540-00-634-4265 | Previous Edition Usable | 5008-106 | OF 8 (Rev. 1-85) U.S. Office of Personnel Management FPM Chapter 295 |
|---|---|---|---|

# EXHIBIT 4

**Department of Veterans Affairs**
**Washington, DC 20420**

**VA HANDBOOOK 5005/148**
**Transmittal Sheet**
**October 15, 2021**

### STAFFING

1. **REASON FOR ISSUE:** To revise the Department of Veterans Affairs (VA) qualification standard for General Attorney, GS-0905 appointed under 5 C.F.R. § 213.3102(d), Entire Executive Civil Service.

2. **SUMMARY OF CONTENTS/MAJOR CHANGES:** This handbook contains mandatory procedures on staffing. Under the authority of 5 C.F.R., Part 6, Exceptions from the Competitive Service, Rule 6, the Secretary of VA may establish regulations for appointment and position changes in the General Attorney occupation. The revised standard is effective on the date of this publication. This qualification standard will be incorporated into the electronic version of VA Handbook 5005, Staffing, which is maintained on the Office of the Chief Human Capital Officer website and the VA Publications website. Significant changes include:

   a. Removes educational requirements.

   b. Removes physical requirements.

   c. Clarifies how Veterans' preference is applied.

   d. Removes the GS-9 grade level.

   e. Removes the occupational examination guide to include the rating procedure and assignment of points.

3. **RESPONSIBLE OFFICE:** Office of the Chief Human Capital Officer, Recruitment and Placement Policy Service (059).

4. **RELATED DIRECTIVES:** VA Directive 5005, Staffing.

5. **RESCISSIONS:** None.

**CERTIFIED BY:**

**BY DIRECTION OF THE SECRETARY OF VETERANS AFFAIRS:**

/s/
Dat P. Tran
Acting Assistant Secretary
for Enterprise Integration

/s/
Gina M. Grosso
Assistant Secretary for Human Resources
and Administration/Operations, Security and
Preparedness

**DISTRIBUTION:** Electronic only

**VA Handbook 5005/148**
**Part II**
**Appendix F36**

**October 15, 2021**

## APPENDIX F36. QUALIFICATION STANDARD

**GENERAL ATTORNEY**                                    **GS-0905-11/15**

**AUTHORITY:** 5 C.F.R., Part 6, Exceptions from the Competitive Service, (Rule VI)

1. **COVERAGE.** The requirements in this standard are for appointment as an Attorney in the Department of Veterans Affairs (VA). These requirements apply to all Attorneys in the General Schedule (GS)-0905 series. Attorneys within VA provide legal advice and services with respect to questions, regulations, practices, or other matters falling within the purview of VA; draft and review Department officials' decisions to ensure compliance with the law, regulation, practices, etc., and legal sufficiency; issue written legal opinions and prepare final decisions in adjudications and appeals involving Veterans' benefits under laws administered by VA; engage in judicial and administrative litigation on behalf of the Secretary at the Federal, state, and local levels; examine contracts; provide substantive recommendations to proposed legislation; prepare interpretive and administrative orders, rules, or regulations; negotiate on behalf of the Secretary with Federal, state, and local stakeholders and prepare final VA decisions and orders on the substantive merits of employment discrimination complaints filed by employees, former employees, or applicants for employment.

2. **BASIC REQUIREMENTS.**

   a. **Citizenship.** Be citizens of, or owe allegiance to, the United States.

   b. **Bar Membership Requirements.** All attorneys in the GS-0905 series must be active members in good standing of the bar of a state or territory of the United States or the District of Columbia and must hold a current, unrestricted license to practice law. Employees must maintain their compliance with this requirement. The duties of the position call for appearance in court. The applicant must be a member in good standing of the bar or be eligible for admission to the bar, of the state or territory of the United States or the District of Columbia where he/she will serve.

   c. **Loss of Good Standing/Bar Membership.** Employees must maintain good standing in a bar of a state or territory of the United States or the District of Columbia while employed as an attorney with VA. Failure to maintain good standing in a bar of a state or territory of the United States, or the District of Columbia provides grounds for removal and possible termination from employment with the VA.

3. **QUALIFICATIONS.** The applicant's experience and training must demonstrate he/she can successfully perform the position's duties. The Office of Personnel Management (OPM) Position Classification Standard for General Attorney Series, GS-0905, provides examples of duties performed at each grade level.

a. **Quality of Experience**. For each grade, applicants must have one or a combination of the following types of experience in the amounts indicated in paragraphs 3.c.(1) through (5):

   (1) Practice of law includes private, state, or Federal practice in any field of law.

   (2) Other legal experience of a responsible nature is experience in any one or a combination of the following performed in a law office, government office, or in the legal department of a business establishment, in the armed forces, or other Federal service:

      (a) Conducting legal research, analyzing statutes, writing legal opinions;

      (b) Writing authoritative or advisory legal opinions involving interpretation of state or Federal laws, regulations, and orders, or the drafting of such regulations or orders; or

      (c) Drafting, analyzing, and other legal activities with respect to bills, regulations, Executive Orders, proclamations, or statutory provisions.

   (3) Where the volume of legal work in one particular subject-matter field (such as administrative law, legislation, guardianship, loans, torts, or any of the several Veterans' benefits, litigations, etc.) requires the appointee to be specifically qualified in that field, this requirement will be identified as a selective factor through job analysis. Such specific qualifications will be documented in the position description.

b. **Exceptions**.

   (1) **Law Clerk.** The occupational series, Law Clerk 0904, consists of employees who have completed the education and/or training required for admission to the bar and are pending admission. The entry grade level for an appointment is the GS-11 grade level. Employees serve in not-to-exceed positions and must earn admission to the bar of a state or territory of the United States or the District of Columbia within 14 months.

   (2) **Legal Intern.** Legal Intern positions must use the Pathways Internship Program for appointment in accordance with Appendix N, Pathways Program.

   (3) **Superior Law Student Program**.

      (a) GS-11 and GS-12 candidates applying under this option are required to furnish certification from the registrar of ranking and other attainments in law school. Candidates who meet the requirements may be eligible for appointment Above the Minimum Entry Rate of the grade under 5 U.S.C. § 5333 and VA Handbook 5007, Part II, Chapter 3, Paragraph 4.

(b) Candidates must graduate in the upper one-third of their law class and

(c) Achieve one of the following accomplishments:

i. Work or achievement of significance on their school's Official Law Review;

ii. Special high-level honors for academic excellence in law school, such as election to the Order of the Coif;

iii. Winning a moot court competition or membership on the moot court team which represents the law school in competition with other law schools;

iv. Full-time or continuous participation in a legal aid program as opposed to intermittent or casual participation;

v. Significant summer law-office clerk experience; or

vi. Other equivalent evidence of superior achievement.

c. **Grade Determinations.** In addition to the basic requirements for employment identified in paragraph 2, the following criteria are the minimum qualifications for non-supervisory positions at each grade level.

(1) **GS-11.**

(a) One year of experience or less in the practice of law as described in paragraph 3a; or

(b) Meets qualification through the Superior Qualification Program.

(2) **GS-12**.

(a) Possession of a Master of Laws (LL.M.) degree;

(b) Possession of a Juris Doctor (JD) degree in a field of law directly pertinent to the work of the position to be filled as evidenced by transcripts and identified as a selective factor in the position description or subsequent position descriptions in a position ladder;

(c) Two years of progressively responsible experience as described in paragraph 3a of which a maximum of one year of the required experience may be acquired prior to admission to the bar, and that demonstrates experience performing similar legal work and responsibilities as described in Nature of Cases or Legal Problems, Type I, in the OPM Position Classification Standard for General Attorney Series, GS-0905; or

      (d) Meets qualification through the Superior Qualification Program.

    (3) **GS-13.** Three years of progressively responsible experience as described in paragraph 3a, of which a maximum of one year of the required experience may be acquired prior to admission to the bar, and that demonstrates experience performing similar work and responsibilities as described in Nature of Cases or Legal Problems, Type II, in the OPM Position Classification Standard for General Attorney Series, GS-0905.



    (4) **GS-14.** Four years of progressively responsible experience as described in paragraph 3a, of which a maximum of one year of the required experience may be acquired prior to admission to the bar, and that demonstrates experience performing similar work and responsibilities as described in Nature of Cases or Legal Problems, Type III and Level of Responsibility D in the OPM Position Classification Standard for General Attorney Series, GS-0905.

    (5) **GS-15.** Four years of progressively responsible experience as described in paragraph 3a, of which a maximum of one year of the required experience may be acquired prior to admission to the bar, and that demonstrates the professional and administrative abilities required to perform similar work and responsibilities as described in Nature of Cases or Legal Problems, Type III and Level of Responsibility E, in the OPM Position Classification Standard for General Attorney Series, GS-0905.

**4. EXAMINING GUIDE.**

  a. In the absence of an occupational-wide examining guide, hiring officials must develop prescribed written rating and ranking methodologies, in consultation with Human Resources office staff, based on thorough job analyses if candidates are evaluated beyond minimum qualifications for vacancies.

  b. In accordance with 5 C.F.R. § 302.101(c), Veterans' preference applies as far as administratively feasible. When candidates are determined to be approximately equally qualified for a particular vacancy, hiring preference will be given to Veterans or preference eligibles as defined in 5 U.S.C. § 2108. At a minimum, facilities must demonstrate from the written record why the qualifications of non-selected preference eligibles and other Veterans are not approximately equal to those of selected candidates who either lack preference or are non-Veterans. Upon request, hiring managers must provide qualified Veterans or preference eligibles with the reasons for non-selection.]